**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| YIN NANTE, Derivatively on Behalf of Nominal Defendant CENTENE CORPORATION, | Case No. |
| Plaintiffs, | |
| v. | |
| SARAH M. LONDON, ANDREW L. ASHER, JESSICA L. BLUME, KENNETH A. BURDICK, CHRISTOPHER J. COUGHLIN, H. JAMES DALLAS, WAYNE S. DEVEYDT, FREDERICK H. EPPINGER, MONTE E. FORD, THOMAS R. GRECO, LORI J. ROBINSON, THEODORE R. SAMUELS, and KENNETH Y. TANJI, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| CENTENE CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Yin Nante ("Plaintiff"), by and through Plaintiff's undersigned counsel, brings this derivative complaint on behalf of Nominal Defendant Centene Corporation ("Centene" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on Plaintiff's attorneys'

1

review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Centene, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Lunstrum v. Centene Corporation et al.*, Case No. 1:25-cv-05659-ALC (S.D.N.Y.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former Centene officers and members of the Company's Board to remedy the Individual Defendants' breaches of their fiduciary duties and violations of federal securities laws between, at least, December 12, 2024 and June 30, 2025, inclusive (the "Relevant Period").

2. Centene is a healthcare company that provides fully integrated and cost-effective services to government-sponsored and commercial healthcare programs, with a focus on under-insured and uninsured individuals. The Company operates through four segments: (i) Medicaid; (ii) Medicare; (iii) Commercial; and (iv) Other.

3. Throughout the Relevant Period, the Individual Defendants repeatedly made positive statements about Centene's enrollment and morbidity rates, as well as strong retention rates in its Medicare business, which the Company asserted supported positive expected revenue and adjusted diluted earnings per share ("EPS") guidance for 2025.

4. However, these statements proved to be false. On July 1, 2025, following the Company's receipt of data showing that Centene's overall market growth across 22 states, or 72% of the Company's marketplace membership, was lower than expected, the Company lowered its revenue projection and its adjusted diluted EPS for 2025.

2

5.      On this news, the Company's stock price fell $22.87 per share, or roughly 40.4%, from a closing price of $56.65 per share on July 1, 2025 to a closing price of $33.78 per share on July 2, 2025.

6.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and/or to fail to disclose, among other things, that: (i) the Company's public statements regarding financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (ii) the Company's enrollment figures were materially overstated; (iii) the Company's morbidity trends were misrepresented across all four of its business segments, especially the Medicare segment; and (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

7.      As a result of the foregoing, the Securities Class Action was filed against the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") in the United States District Court for the Southern District of New York.

8.      As a direct and proximate cause of the Individual Defendants' misconduct, Centene has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action and the cost of repurchasing its own shares at artificially inflated prices, as well as reputational harm and loss of goodwill.

9.      In light of the breaches of fiduciary duty by the Individual Defendants, their collective engagement in fraud, the substantial likelihood of liability in this action and the Securities Class Action, and the Individual Defendants' longstanding personal and business relationships, the current Board cannot consider a demand to commence litigation on behalf of the

Company and against themselves with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because demand would be a futile and useless act.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC; Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5); and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     Venue is proper in this District pursuant to does 28 U.S.C. § 1391(a): (i) Centene maintains its principal place of business in this District; (ii) one of more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the acts and omissions alleged herein occurred in this District, including Defendants' participation in the

wrongful acts detailed herein; and (iv) Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

15. Plaintiff is a current shareholder of Centene and has continuously held Centene shares at all relevant times.

16. Nominal Defendant Centene is a Delaware corporation with its principal executive offices located at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CNC."

17. Defendant Sarah M. London ("London") has served as a director of the Company since September 2021 and as CEO since March 2022. Defendant London previously served as Vice Chairman of the Company from September 2021 to March 2022. According to Schedule 14A filed with the SEC on March 27, 2025 (the "2025 Proxy Statement"), Defendant London received $20,602,148 in total compensation from the Company in 2024.

18. Defendant Andrew Lynn Asher ("Asher") has served as CFO of the Company since May 2021. According to the 2025 Proxy Statement, Defendant Asher received $11,182,412 in total compensation from the Company in 2024.

19. Defendant Jessica L. Blume ("Blume") has served as a director of the Company since February 2018. Defendant Blume also serves as Chair of the Company's Governance Committee and as a member of the Company's Audit and Compliance Committee (the "Audit Committee"). According to the 2025 Proxy Statement, Defendant Blume received $369,969 in total compensation from the Company in 2024.

20. Defendant Kenneth A. Burdick ("Burdick") has served as a director of the Company since January 2022. Defendant Burdick previously served as Executive Vice President

of Markets and Products division of the Company. Burdick also serves as Chair of the Company's Quality Committee. According to the 2025 Proxy Statement, Defendant Burdick received $423,234 in total compensation from the Company in 2024.

21.    Defendant Christopher J. Coughlin ("Coughlin") has served as a director of the Company since January 2022. Defendant Coughlin also serves as Chair of the Company's Compensation and Talent Committee and as a member of the Company's Audit Committee. According to the 2025 Proxy Statement, Defendant Coughlin received $369,969 in total compensation from the Company in 2024.

22.    Defendant H. James Dallas ("Dallas") has served as a director of the Company since January 2020. Defendant Dallas also serves as a member of the Company's Audit Committee as well as the Quality Committee. According to the 2025 Proxy Statement, Defendant Dallas received $349,969 in total compensation from the Company in 2024.

23.    Defendant Wayne S. DeVeydt ("DeVeydt") served as a director of the Company from January 2022 until August 1, 2025. During the Relevant Period, Defendant DeVeydt served as Chair of the Company's Audit Committee and as a member of the Company's Governance Committee. According to the 2025 Proxy Statement, Defendant DeVeydt received $379,969 in total compensation from the Company in 2024.

24.    Defendant Frederick H. Eppinger ("Eppinger") has served as a director of the Company since April 2006. Defendant Eppinger currently serves as Chairman of the Board and as a member of the Company's Quality Committee. According to the 2025 Proxy Statement, Defendant Eppinger received $590,026 in total compensation from the Company in 2024.

25.    Defendant Monte E. Ford ("Ford") has served as a director of the Company since November 2022. Defendant Ford also serves as a member of the Company's Compensation and

Talent Committee as well as the Quality Committee. According to the 2025 Proxy Statement, Defendant Ford received $349,969 in total compensation from the Company in 2024.

26.     Defendant Thomas R. Greco ("Greco") served as a director of the Company from August 2024 until August 22, 2025. During the Relevant Period, Defendant Greco also served as a member of the Company's Compensation and Talent Committee as well as the Governance Committee. According to the 2025 Proxy Statement, Defendant Greco received $234,857 in total compensation from the Company in 2024.

27.     Defendant Lori J. Robinson ("Robinson") served as a director of the Company from October 2019 until May 2025. According to the 2025 Proxy Statement, Defendant Robinson received $324,969 in total compensation from the Company in 2024.

28.     Defendant Theodore R. Samuels ("Samuels") has served as a director of the Company since January 2022. Defendant Samuels also serves as a member of the Company's Compensation and Talent Committee as well as the Quality Committee. According to the 2025 Proxy Statement, Defendant Samuels received $349,969 in total compensation from the Company in 2024.

29.     Defendant Kenneth Y. Tanji ("Tanji") has served as a director of the Company since February 2025. Defendant Tanji also serves as a member of the Company's Audit and Compliance Committee.

30.     Defendants London, Asher, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Robinson, Samuels, and Tanji are referred to collectively as the "Individual Defendants," and with Centene, as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of Centene, and because of their ability to control the business and corporate affairs of Centene, the Individual Defendants owed Centene and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Centene in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Centene and its shareholders.

32.     Each director and officer of the Company owes to Centene and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Centene, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Centene, the absence of good faith on their part, or a

8

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.    To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Centene were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Missouri, and the United States, and pursuant to Centene's own Code of Conduct (the "Code of Conduct");

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Centene conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Centene and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Centene's operations would comply with all applicable laws and Centene's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

10

38.     Each of the Individual Defendants further owed to Centene and the shareholders the duty of loyalty requiring that each favor Centene's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Centene and were at all times acting within the course and scope of such agency.

40.     Because of their advisory, executive, managerial, and directorial positions with Centene, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Centene.

## CENTENE'S CODE OF CONDUCT

42.     The Company's Code of Conduct states, in relevant part, that:

> Centene is a trusted, national leader in government-sponsored and subsidized healthcare programs. We've earned this trust by building collaborative relationships, operating with transparency, and by aligning our goals companywide and with our partners. We continue to strengthen that trust and leadership position by living our Mission of "Transforming the health of the communities we serve, one person at a time.". . .
>
> Our Code of Conduct, approved by our Board of Directors, outlines our Values, expectations, requirements, and places to go for help in any situation, all to ensure we adhere to the highest ethical standards and fulfill the expectations of our government partners, our providers, our members, and one another. You should consider the Code your guide to doing what's right.

11

43.    The Code of Conduct applies to "all directors, officers, and persons employed by Centene Corporation and its subsidiaries (collectively "Centene" or "the Company"), as well as our subcontractors, vendors, stakeholders, and other interested parties."

44.    Under a heading titled "Centene's Risk Management and Ethics & Compliance Programs," the Code of Conduct states, in relevant part:

> Centene's Enterprise Risk Management process ensures risks are systematically identified, assessed, and managed. Our directors, officers, employees, and other stakeholders play an important role in risk identification. By listening carefully, asking questions, and speaking up, employees shed light on potential risks and help define the opportunity to address them.

45.    Under a heading titled "Financial Integrity and Internal Controls," the Code of Conduct states:

> Our Company operates in a highly regulated environment, and the records of our business practices, including our financial bookkeeping and accounting, claims- related activity, and member and provider interactions, must be accurate, complete, and clear. No matter your role with the Company, you must:
>
> - Ensure any documents you create or modify represent an accurate, complete, and clear record of the facts.
>
> - Exercise diligence in your reviews and avoid "rubber-stamping" approvals. You are accountable for any document you review and approve, even if the document did not originate with you.
>
> - Hold yourself and your team members to the highest standard of quality. It is not enough that the accuracy, completeness, and clarity of a record represents our "best effort." The record must be right.
>
> - Comply with all applicable laws, regulations, contractual requirements, and policies regarding the content, format, and submission of Company records. Even an accurate record may place the Company at risk if the record fails to adhere to applicable technical specifications.
>
> - Seek guidance if you have questions or are unsure what to do. The requirements, particularly with respect to financial reporting, can be complex. Your People Leader, Legal counsel and the Ethics &

12

> Compliance and Internal Audit Departments are available to assist you.

46.     Under a heading titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

> Conflicts of interest can occur when personal situations create an actual, potential, or perceived conflict between the Company's best interest and an individual's own personal or outside business interests. Conflicts can also occur within the Company, where the activities of one part of the business could create a barrier to opportunities for other parts (referred to as "Organizational Conflicts of Interest"). Serving our customers with integrity means that we all must put our personal interests aside and make decisions that best advance the Company's mission.
>
> All Centene team members are expected to know and follow our Conflict of Interest policy so they may recognize potential conflicts and promptly disclose and address them. Upon hire and annually thereafter, all directors, officers, and employees complete a Conflict of Interest disclosure. A disclosure doesn't necessarily mean that a conflict exists. Instead the disclosure offers the Company an opportunity to review the circumstances and consider whether steps can be taken to reduce risk.

47.     Under a heading titled "Engaging Appropriate Communications and Public Engagement," the Code of Conduct states, in relevant part:

> In fulfilling our mission to "Transform the health of the communities we serve, one person at a time," Centene takes pride in the engagement of our team members in the communities themselves.
>
> To best serve the needs of the Company and its customers, Centene directors, officers, and employees must take care to ensure that all public-facing communications and engagement are performed in compliance with applicable requirements. . . .

## CENTENE'S AUDIT AND COMPLIANCE COMMITTEE CHARTER

48.     Centene's Audit and Compliance Committee Charter states that the Audit Committee's purpose is:

> [T]o assist the Board's oversight of: the integrity of the Company's financial statements; the qualifications and independence of the Company's independent registered public accounting firm engaged for the purpose of

13

preparing or issuing an audit report for inclusion in the Company's Annual Report on Form 10-K (the "independent auditor"); the performance of the Company's internal audit function and independent auditor; the Company's enterprise risk management framework and the Board's process for overseeing the Company's exposure to risks; the Company's compliance with legal and regulatory requirements; the Company's ethics and compliance programs and the effectiveness of its compliance function, including compliance with its Code of Conduct; and cybersecurity, business continuity, disaster recovery and other risks related to information technology ("IT"). The Committee is also responsible for preparing an Audit and Compliance Committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

49.     In a section titled "Committee Authority and Responsibilities," the Audit and Compliance Committee Charter states that the Audit Committee has the following responsibilities, among others:

1.     General. The Committee shall discharge its responsibilities and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audits, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles ("GAAP") or applicable law, or to guarantee the independent auditor's reports. . . .

3.     Audited Financial Statements.

a.     *Review and Discussion*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." Additionally, the Committee shall discuss with the

independent auditor the results of the annual audit and any other matters required to be communicated to the Committee under auditing standards of the PCAOB and SEC rules.

b. *Recommendation to Board Regarding Financial Statements*. The Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

c. *Audit and Compliance Committee Report*. The Committee shall prepare a committee report for inclusion in the annual proxy statement of the Company.

4. Review of Other Financial Disclosures.

a. *Quarterly Financial Statements*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The independent auditor shall discuss promptly with the Committee and the Chief Financial Officer any matters identified in connection with the independent auditor's review of quarterly financial information which are required to be discussed by applicable auditing standards.

b. *Earnings Release and Other Financial Information*. The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information, as well as financial information and earnings guidance provided to analysts, rating agencies and others

5. Controls and Procedures

a. *Oversight*. The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

b. *Oversight of Internal Audit Function*. The Committee shall assist the Board in overseeing the performance of the Company's internal audit function, including the following:

15

- Review the reporting relationship of the internal audit function and periodically meet separately with the Company's Chief Internal Auditor.

- Review and approve the internal audit function's plan, budget and activities for the upcoming fiscal year and evaluate the internal audit function's responsibilities and staffing.

- Review the status of any existing or newly identified significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting on a quarterly basis.

- Review the compensation arrangements for the Chief Internal Auditor in coordination with the Compensation and Talent Committee.

c. *Hiring Policies*. The Committee shall establish policies regarding the hiring of current or former employees of the Company's independent auditor.

d. *Procedures for Complaints*. The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

e. *Evaluation of Financial and Internal Audit Management*. The Committee shall coordinate with the Compensation and Talent Committee the evaluation of the Company's Chief Financial Officer, Chief Accounting Officer and Chief Internal Auditor.

f. *Funding*. The Company shall provide for appropriate funding, as determined by the Committee, in its capacity as a committee of the Board, for payment of:

- compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services; and

- ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

16

6.  Risk Management.

a.  The Committee shall review the Company's enterprise risk management reporting processes designed to assist the Board in its oversight of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies.

b.  The Committee shall oversee the monitoring of risk exposures and the effectiveness of the enterprise risk management framework.

c.  The Committee shall meet periodically with management to review the Company's significant financial, regulatory, reputational or other risk exposures, and the steps management has taken to identify, monitor, assess and control or avoid such exposures.

7.  Financial Matters.

a.  The Committee shall periodically review with management, and provide oversight of, the Company's capital structure and liquidity position, including its cash flows.

b.  The Committee shall make recommendations to the Board regarding any changes to the Company's capital structure that the Committee determines, in its business judgment, to be necessary or advisable. This responsibility includes, without limitation, oversight of the following:

- Transactions involving the Company's equity securities such as public offerings, stock repurchase programs or stock splits (but not including equity compensation plans);

- transactions involving the Company's debt securities and other material debt obligations undertaken by the Company;

- the Company's dividend policies and practices; and

- statutory capital requirements applicable to the Company's regulated subsidiaries.

c.  The Committee shall oversee the Company's investment policies and strategy.

d. In connection with the Committee's risk management oversight responsibilities, the Committee shall review the Company's major insurance programs, such as directors and officers liability coverage and cyber liability coverage.

e. The Committee shall review significant financial activities, including the use of swaps and derivatives and similar risk management vehicles.

f. The Committee shall oversee the implementation and execution of the Company's corporate tax policies.

g. The Committee shall perform such other financial oversight responsibilities as the Board may request. . . .

10. <u>Ethics & Compliance Program</u>.

a. The Committee shall oversee matters related to the Company's compliance with laws and regulations, including those concerning fraud, waste and abuse and federal and state healthcare program requirements. This oversight responsibility shall include inquiries from, and audits, investigations and surveys by, federal and state regulatory and enforcement agencies and related legal and administrative proceedings.

b. The Committee shall oversee the Company's Ethics & Compliance Program (the "Program"), including the performance of the Chief Risk, Ethics & Compliance Officer, and shall review and concur in the appointment, promotion or dismissal of the Chief Risk, Ethics & Compliance Officer, who has direct reporting authority to the Board. In fulfilling this responsibility, the Committee shall consider, among other things, the relevant expectations and requirements of federal and state regulatory and enforcement agencies.

c. At least annually, the Committee shall review the design, dedicated resources and operational effectiveness of the Program. In connection with this assessment, the Committee shall obtain and consider reports by the internal audit department as it deems appropriate. If the Committee determines that it is necessary to retain one or more external experts to assist the Committee with the evaluation, it shall do so.

d. The Committee shall oversee, and periodically review, the process that the Company has developed for identifying, assessing, prioritizing and mitigating legal, regulatory and

compliance risks.

e.  The Committee shall annually review, and approve, the compliance audit, testing and monitoring plan developed by management.

f.  The Committee shall review periodically the effectiveness of the Company's process for screening individuals and/or entities that have been excluded, debarred, suspended from or otherwise deemed ineligible for, participation in any applicable state or federal healthcare, procurement and/or non-procurement programs.

g.  The Committee shall receive periodic reports from the Chief Risk, Ethics & Compliance Officer, who has express authority to communicate directly with the Committee as necessary, and other members of management, on, among other topics:

- Management's assessment of the efficacy of the Program;

- Key Program initiatives, including the development and execution of the Company's Annual Compliance Work Plan;

- Management's annual review of the Company's Code of Conduct and compliance policies and procedures;

- The development and implementation of the Company's annual ethics and compliance training and education program;

- Reports of ethics and compliance concerns received through "open door" channels and mechanisms (such as hotlines), including potential violations of laws, regulations, administrative directives, federal and healthcare program requirements, the Code of Conduct and/or the Company's compliance policies and procedures;

- The process established for assessing, investigating and resolving reports of ethics and compliance concerns;

- Findings and conclusions of compliance audits, tests and monitoring activities, including related root cause analyses;

- Key remedial initiatives undertaken by the Company, including the development and execution of corrective

19

actions plans; and

- Disclosures to regulators and enforcement agencies.

## SUBSTANTIVE ALLEGATIONS

### Background

50.     Centene is a healthcare company that provides integrated and cost-effective services to government-sponsored and commercial healthcare programs, with a focus on under-insured and uninsured individuals. According to the Company, it offers "affordable and high-quality products to more than 1 in 15 individuals across the nation, including Medicaid and Medicare members (including Medicare Prescription Drug Plans) as well as individuals and families served by the Health Insurance Marketplace."

51.     The Company operates through four segments: (i) Medicaid; (ii) Medicare; (iii) Commercial; and (iv) Other.

52.     The Medicaid segment is the Company's largest segment, accounting for 62% of the Company's total external revenue in 2024. It includes a number of government-sponsored healthcare programs, including the Temporary Assistance for Needy Families program; the Aged, Blind or Disabled program; the Children's Health Insurance Program; Long-Term Services and Supports; Foster Care; Medicaid Expansion programs; Medicare-Medicaid Plans, which cover beneficiaries who are dually eligible for Medicaid and Medicare; and other state-based programs.

53.     The Company's Medicare segment includes certain government-sponsored healthcare programs, including Medicare Advantage, Medicare Supplement, Dual Eligible Special Needs Plans and Medicare Prescription Drug Plans. In 2024, the Medicare segment accounted for 14% of the Company's total external revenue.

54.     The Company's Commercial segment includes health insurance products through the Health Insurance Marketplace, and through large and small employer groups. In 2024, the Commercial segment accounted for 21% of the Company's total external revenue.

55.     The "Other" segment includes the Company's pharmacy operations, Envolve Benefit Options' vision and dental services, clinical healthcare offerings, behavioral health offerings, the TRICARE program, and corporate management companies, among others. In 2024, the Other segment accounted for 3% of the Company's total external revenue.

**<u>Materially False and Misleading Statements</u>**

56.     On December 12, 2024, Centene issued a press release announcing its financial guidance for 2025, which provided, in relevant part:

> For its 2025 fiscal year, the Company's guidance is as follows:
>
> - Total revenues of $166.5 billion to $169.5 billion.
> - Premium and service revenues of $154.0 billion to $156.0 billion.
> - GAAP diluted earnings per share (EPS) of greater than $6.19.
> - Adjusted diluted EPS of greater than $7.25.

57.     The December 12, 2024 press release included the following quote from Defendant London:

> Centene is a mission-driven organization, dedicated to delivering high quality outcomes for more than 28 million members, many of whom are among the nation's most medically complex and historically underserved populations. Over the last three years we improved our core operations and invested in the experience of our customers and providers, all while delivering on our financial commitments[.] This morning, we are reiterating our 2024 adjusted diluted EPS guidance of greater than $6.80. Additionally, we issued 2025 adjusted diluted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth.

58.     During Centene's December 12, 2024 Analyst/Investor Day, the Company provided details on its 2025 financial guidance, with Defendant Asher stating, in relevant part:

> Let's start with the basics. Stability in earnings power in the face of

21

unprecedented headwinds provide Centene with a solid jump off point for 2025 and beyond. ***As you've likely seen by now, we've issued 2025 adjusted EPS guidance of greater than \$7.25, representing more than 6% year-over-year growth compared to this year's current outlook. We are using today as an opportunity to set the floor for 2025 guidance, inclusive of an expectation for a 3% to 4% Medicaid composite rate adjustment***. . . .[1]

Now let's move to why you joined us today: the future. Starting with the first ingredient you need to drive earnings growth: revenue growth. ***We are expecting 7.6% growth at the midpoints, \$11 billion of additional premium revenue compared to 2024 for a 2025 guidance midpoint of \$155 billion of premium and service revenue***. . . .

What does all of this add up to? ***Initial 2025 adjusted diluted EPS guidance of greater than \$7.25***. You can see 2025 guidance elements summarized here, including our first year with a diluted share count starting with a 4. Note also an adjusted effective tax rate of 22% to 23%, which is down a little from 2024, primarily driven by a state tax benefit expected to be realized in Q4 of 2025.

59.     On February 4, 2025, Centene issued a press release announcing its financial results for the fourth quarter and full year of 2024. The Company also informed investors of an increase to the Company's previously issued guidance for 2025. The press release stated, in relevant part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by \$4.0 billion to a range of \$158.0 billion to \$160.0 billion to reflect the following expectations:

- outperformance in our PDP annual enrollment resulting in an additional \$1.5 billion premium revenue,
- outperformance in our Medicare Advantage annual enrollment resulting in \$1.0 billion of additional premium revenue, and
- \$1.5 billion of additional Medicaid premium revenue due to a program change adding behavioral health coverage in one of our state contracts.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than \$6.19 and its 2025 adjusted diluted EPS guidance floor of greater than \$7.25.

---

[1] All emphasis added, unless otherwise noted.

60.    That same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2024, during which Defendant London touted the "durability" of the Company's earnings power, stating, in relevant part:

> Strong results that demonstrate the durability of our earnings power and position the company to execute against our strategic goals in 2025. ***Driven by better-than-expected results during the Medicare annual enrollment period and a program expansion in Medicaid, we are lifting our full year 2025 revenue guidance by $4 billion.***
>
> Our outlook for full year 2025 adjusted diluted EPS remains unchanged at greater than $7.25, and we are pleased with the trajectory we are on at this early stage in the year. To that end, let's talk about the opportunities in each of our business lines and how we are positioned for 2025.

61.    During the same earnings call, Defendant Asher reiterated the Company's increased financial guidance for 2025, stating, in relevant part:

> So we are increasing our consolidated 2025 premium and service revenue guidance range by $4 billion to a range of $158 billion to $160 billion of premium and service revenue. This is good news as you think about the long-term earnings power of Centene. At this very early point in the year, we are reiterating our 2025 adjusted diluted EPS guidance floor of greater than $7.25. Quick comment on 2026 Medicare rates. The preliminary percentage rate change for us is in the low to mid- 3s, including the positive impact of STARS from the work we did in 2023 and 2024.

62.    On March 27, 2025, Centene filed its 2025 Proxy Statement with the SEC. The 2025 Proxy Statement was solicited by Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji pursuant to Section 14(a) of the Exchange Act.

63.    The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (i) re-elect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board; (ii) approve, on an advisory basis, the compensation of named executive officers; (iii) ratify the selection of the Company's independent registered public

23

accounting firm for 2025; and (iv) approve the Company's 2025 Stock Incentive Plan (the "Incentive Plan")[2].

64.    The 2025 Proxy Statement assured investors that the Board was effectively overseeing risks to the Company, stating, in relevant part:

> The Board has overall responsibility for the oversight of enterprise-wide risk management at Centene, while management is responsible for day-to-day risk management. The Board implements its risk oversight function both as a whole and through its committees. Each Board committee oversees risks associated with its respective principal areas of focus and then reports to the Board. These areas of focus include competitive, economic, operational, financial (including accounting, credit, liquidity and tax), legal, regulatory, compliance, political, strategic, reputational and other risks.
>
> The oversight responsibility of the Board and its committees is assisted by management reporting processes designed to provide visibility to the Board of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies. The Company's process for the evaluation of risk is based on a blend of principles associated with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) enterprise risk management framework, *Enterprise Risk Management – Integrating with Strategy and Performance* and *ISO 31000: 2018 Risk Management*. The primary goals of the enterprise risk management program are to enhance management's ability to identify and assess the Company's current risk status, gain insights on emerging risks, improve management's strategic and operational decision-making ability and provide clear and timely communication of cross-functional risks to management and the Board. The enterprise risk management process is facilitated by the Company's Risk Management department. An enterprise risk management committee comprised of senior leaders within the Company meets at least four times per year to discuss the most significant risks to the Company identified by the Company's enterprise risk management process and the steps management has taken to identify, monitor, assess and control or avoid such exposures. The enterprise risk management committee also reviews performance measures against the

---

[2] The 2025 Proxy Statement explains that the Incentive Plan would increase the aggregate number of shares authorized for issuance under the existing plan to 15,000,000 shares and noted that if approved by shareholder, the Incentive Plan, it would be administered by the Compensation and Talent Committee. It further noted that "employees, officers, directors, consultants and advisors are eligible to receive awards under the Plan" and that the Incentive Plan "grants [] restricted stock units, stock options, stock appreciation rights, restricted stock, and any other stock-based awards that have values based on the values of shares, including but not limited to grants of stock and grants of rights to receive stock in the future."

company's risk appetite and tolerance and provides recommendation(s) of corrective action, where appropriate. The enterprise risk management process is an active process and is continually enhanced and updated.

The Company's Risk Management department provides an enterprise risk management report to the full Board at least four times per year. Each Board committee reports to the Board any significant issues relating to their relevant risk areas.

65.    The 2025 Proxy Statement also assured investors that the Company's Board and executive officers were required to follow the Code of Conduct, providing:

The Company has published on its website (www.centene.com) its Code of Conduct, which applies to all officers, employees and directors. Any waiver of, or amendments to, the Code of Conduct for directors or executive officers, including the chief executive officer, the chief financial officer and the principal accounting officer, must be approved by the Governance Committee, and any such waivers or amendments will be disclosed within four business days by the Company by posting such waivers or amendments to its website. Both the Audit and Compliance Committee and the Governance Committee review management's monitoring of compliance with the Company's Code of Conduct.

66.    As a result of Defendants London, Blume, Burdick, Coghlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji causing the 2025 Proxy Statement to be misleading, shareholders voted to (i) re-elect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board; (ii) approve, on an advisory basis, the compensation of named executive officers; (iii) ratify the selection of the Company's independent registered public accounting firm for 2025; and (iv) approve the Company's 2025 Stock Incentive Plan (the "Incentive Plan").

67.    As a result of shareholders approving the Incentive Plan, an aggregate number of 15,000,000 shares were authorized for disbursement. As such, the Individual Defendants can receive material personal benefits in the form of stock awards and will continue to receive such benefits pursuant to the Incentive Plan in the future.

25

68.    On April 25, 2025, Centene issued a press release announcing its financial results for the first quarter of 2025 and provided updated financial guidance for fiscal year 2025, stating, in relevant part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $6.0 billion to a range of $164.0 billion to $166.0 billion to reflect the following expectations:

- $5.0 billion of additional Marketplace premium revenue due to outperformance in enrollment throughout the first quarter; and
- outperformance in the Medicare Advantage annual enrollment period resulting in $1.0 billion of additional premium revenue.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

The Company's annual guidance for 2025 is as follows and will be discussed further on our conference call:

|  | Full Year 2025 |
|---|---|
| GAAP diluted EPS | > $6.19 |
| Adjusted diluted EPS (1) | > $7.25 |

(1) A full reconciliation of adjusted diluted EPS is shown in the Non-GAAP Financial Presentation section of this release.

|  | Full Year 2025 | |
|---|---|---|
|  | Low | High |
| Total revenues (in billions) | $ 178.5 | $ 181.5 |
| Premium and service revenues (in billions) | $ 164.0 | $ 166.0 |
| HBR | 88.9 % | 89.5 % |
| SG&A expense ratio | 7.7 % | 8.2 % |
| Adjusted SG&A expense ratio (2) | 7.7 % | 8.2 % |
| Cost of services expense ratio | 88.2 % | 88.8 % |
| Effective tax rate | 21.5 % | 22.5 % |
| Adjusted effective tax rate (3) | 22.0 % | 23.0 % |
| Diluted shares outstanding (in millions) | 491.0 | 494.0 |

(2) Represents a non-GAAP financial measure. Adjusted SG&A expense ratio excludes acquisition and divestiture related expenses of approximately $550 thousand.

(3) Represents a non-GAAP financial measure. Adjusted effective tax rate excludes income tax effects of adjustments of approximately $165 million to $168 million.

69.    Defendant London was quoted in the April 25, 2025 press release as stating, in relevant part:

Our first quarter results demonstrate the resiliency of Centene's platform

26

and the progress we are making as an organization while navigating a dynamic policy landscape. *We are pleased to reiterate our full year 2025 adjusted diluted earnings per share outlook of greater than $7.25 and continue to see attractive opportunities to grow from the strength of our core businesses in the years to come.*

70.     Also on April 25, 2025, Centene hosted an earnings call to discuss its financial results for the first quarter of 2025, wherein Defendant Asher touted the Company's 2025 Medicare and Medicaid performance and its financial guidance, stating, in relevant part:

> *On our entire Medicaid book, we are projecting a full year composite rate increase at 4% plus.*
>
> *Medicare Advantage and PDP both outperformed on membership. We retained more membership than expected during the Medicare Advantage open enrollment period, which bodes well for long-term earnings power. This is contributing $1 billion to our 2025 premium and service revenue guidance increase. PDP ended the quarter at 7.9 million members, strong growth from 2024.*
>
> Medicare segment HBR was 86.3% in the quarter, which, as we covered in past discussions, is expected to follow an inverted slope line compared to 2024 due to the Inflation Reduction Act program changes. So a lower Medicare segment HBR and higher earnings early in the year and a higher HBR and lower earnings later in the year.
>
> Within the Medicare segment, both Medicare Advantage and PDP businesses were on track in the quarter. And you'll see an intra-year increase in the Medicare Advantage PDR, premium deficiency reserve, that was planned for and is solely related to the sloping of earnings during 2025. So no change in our view of Medicare Advantage earnings for 2025.
>
> Commercial membership was very strong in the quarter, not just during open enrollment for 1/1, but also in February and March. Q1 Commercial segment HBR at 75.0% was a little higher than last year's 73.3%, driven by 1.9 million new Marketplace Members in Q1. These members are utilizing a little more than last year's new members. But because it's so early in the year, we are not yet recognizing a matching offset for risk adjustment. We'll know more when we get the first Wakely file in late June, early July.
>
> *Given top line performance in Q1, and even as we forecast net membership attrition throughout the rest of the year, we are adding $5 billion of premium revenue to 2025 guidance related to Marketplace*. . . .

27

*Looking at the full year, we are pleased to reiterate greater than $7.25 of adjusted diluted EPS. As you've heard, the theme of the quarter was strong premium revenue growth and stronger-than-expected membership. Accordingly, we are increasing premium and service revenue guidance to a midpoint of $165 billion, up from $159 billion.*

71.     During the question and answer portion of the earnings call, in response to a question on the increase in Medicaid rates in the second half of 2025, Defendant London stated, in relevant part:

> So composite rate for the full year, we're now seeing at mid-4s, and the rate negotiations relative to upcoming, so think about the 7/1 cohort, which is the next cycle, we will start to get visibility into that as we get in -- later into Q2. So more to come on that front. But as you heard me say, I think we're seeing good continued momentum in our discussions with state partners. And the fact that as we roll forward, we have further completion data behind us in terms of the acuity patterns that started to emerge in Q2 right around this time last year. So that helps bolster the conversation in terms of supporting the actuarial calculus, and I think helps in conversations with the state. So obviously, looking to that 7/1, 9/1 and 10/1 cohort to contribute to the back half of the year.
>
> And then I think you asked about Medicaid utilization beyond flu. And so we continue to see largely the same themes. But Drew, maybe you want to click into a few of those.

72.     In response to the same question, Defendant Asher stated:

> No, clearly, we had the flow of $130 million in Q1. That's transitory. Behavioral health continues to be a trend item. We've mentioned that probably for the last 6 quarters. We've got initiatives to tackle that and working with our state partners, things like applied behavioral analysis. I guess, no surprise coming out of the pandemic era. There's pockets of home health. We've mentioned that before, things like attended services that where we can tighten UM, do some audits. And then probably the area of uptick is high-cost drugs. An example might be Elevidys, which curiously is a $3.2 million single-treatment drug that if you read the JAMA articles, it's questionable in terms of the efficacy. And looking at -- we're all trying to keep health care affordable. That seems quite extreme for a cost of a single treatment for a newly approved drug last year. So that's an area of uptick that effectively is on the back of the federal and state governments and us as a payer.
>
> So that's one thing we're watching, and we thought about that as we lifted

28

the Medicaid HBR into the mid- to high 90-ones from our previous guidance.

73.    Also during the 1Q25 Earnings Call, an analyst asked Defendants London and

Asher the following question:

> Regarding the exchanges. So firstly, I'm having a little bit of trouble bridging to your expected $5 billion of additional revenue. If I take your roughly 0.5 million more lives, 550 revenue PMPM, I'm still getting to only about $3 billion to $4 billion. And I know you're still assuming the same in your attrition cadence. So I was wondering if you could help me bridge that gap in case I'm missing something.
>
> And then I understand you're treating incremental exchange growth in 1Q to be lower margins. It sounds like you could be conservatism, but wondering what exact margin level you're assuming on those lives. And lastly, very quickly, when you hear the most bearish concerns about the magnitude of potentially millions of fraudulent lives and the exchanges and the risk that might pose to you next year. I'm just curious to hear your general thoughts overall level of confidence that this most bear-case scenario that's rolling around won't actually happen.

74.    In response, Defendant London stated:

> Thanks for the question. So let me start with the last piece of that and we can sort of work our way backwards. There's obviously been a lot of concern about the idea that there is sort of ramp in broker fraud or ghost members in the population, I think it's important to note that the movement to drive additional program integrity, which was understandably loosened during the pandemic, started more than a year ago and a lot of the program integrity measures that are being put in place are things that we've operated with in the past, which means we have baseline and benchmark data around what some of these rates should be.
>
> We were a pioneer in terms of implementing the agent of record lock. Back in January of last year we introduced that. We were the first to put it in place. And we're seeing the benefit of that. And we track very closely the levels of complaints that come in from members or where there are broker issues throughout the year and can understand whether we're seeing upticks in that and anything different than what we would expect.
>
> So I think we have accounted for things like the failure to reconcile in our full year outlook. Again, the timing of that has shifted. But the team is pretty experienced at understanding the dynamics in the membership. Obviously, the new utilizers that we have where we're seeing utilization is frankly a

good sign because it's hard for ghosts to utilize the system. And we feel like we have all the data we need to account for what -- how this will play out both through the remainder of this year and in 2026.

I think you asked about sort of the level of margin for the new member cohort. Overall, we still expect to be in the 5% to 7.5% margin range for Marketplace. And as I said, we've encountered for a continuation of the level of utilization we're seeing in that new member base. In the full year outlook, our renewal members are as expected.

75.    In response to the same question, Defendant Asher stated, in relevant part:

Yes, then on your first question, the -- so we put up $10.1 billion of commercial premium in Q1. And if you do the math on our guidance, it's $39 billion for the full year. So we are accounting for attrition throughout the rest of the year to end up in the high 4s. So that sort of hangs together.

76.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's public statements regarding financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (ii) the Company's enrollment figures were materially overstated; (iii) the Company's morbidity trends were misrepresented across all four of its business segments, especially the Medicare segment; and (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth is Revealed**

77.    On July 1, 2025, the truth was revealed when Centene issued a press release withdrawing its previously reported 2025 financial guidance. In relevant part, the July 1 Press Release stated:

**Marketplace 2025 Risk Adjustment Update**

30

The Company recently received and analyzed its first view of 2025 industry Health Insurance Marketplace (Marketplace) data from Wakely, an independent actuarial firm, covering 22 of Centene's 29 Marketplace states, and representing approximately 72% of the Company's Marketplace membership. This data is submitted to Wakely by most Marketplace insurance carriers.

Based upon the Company's preliminary interpretation of the data and discussions with Wakely, the overall market growth in the 22 states is lower than expected and the implied aggregate market morbidity in those states is significantly higher than, and materially inconsistent with, the Company's assumptions for risk adjustment revenue transfer used in the preparation of its previous 2025 consolidated guidance.

***The Company's preliminary analysis of the 22 states results in a reduction to its previous full year net risk adjustment revenue transfer expectation by a preliminary estimate of approximately $1.8 billion which corresponds to an adjusted diluted EPS impact of approximately $2.75. This preliminary estimate includes a projection of the remaining eight months of 2025 and is based on 2025 paid claims through April 30 from Wakely for the 22 states, as well as the Company's membership estimates and morbidity trend estimates for both its members and the aggregate market, calculated by state.***

The Company does not have information or estimates for its remaining seven Marketplace states, but anticipates, due to the morbidity trends observed in the 22 states, an additional reduction to its net risk adjustment revenue transfer expectation with a corresponding adjusted diluted EPS impact.

Regarding the 2026 Marketplace plan year, the Company has commenced the process of refiling 2026 Marketplace rates to reflect a higher projected baseline of Marketplace morbidity than previously expected. The Company currently expects to be able to take corrective pricing actions for 2026 in states representing a substantial majority of its Marketplace membership.

78.    On this news, the Company's stock price fell $22.87 per share, or roughly 40.4%, from a closing price of $56.65 per share on July 1, 2025 to a closing price of $33.78 per share on July 2, 2025.

31

79.     Following Centene's disclosure, multiple analysts lowered their price targets. For instance, on July 2, 2025, Barclays cut its target from $65 to $45. That same day, CFRA reduced its price target from $48 to $37.

## SHARE REPURCHASES DURING THE RELEVANT PERIOD

80.     During the Relevant period, the Individual Defendants caused Centene to repurchase approximately 7.4 million shares of its common stock while the stock price was artificially inflated due to the false and misleading statements detailed above, paying an aggregate amount of approximately $442.3 million.

81.     According to the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC, Centene made the following repurchases during the Relevant Period:

| Date Range | Number of Shares Repurchased | Average Price Paid Per Share | Approximate Total Price Paid |
|---|---|---|---|
| December 1-31, 2024 | 14,000 | $59.45 | $832,300 |
| January 1-31, 2025 | 14,000 | $62.70 | $877,800 |
| February 1- 28, 2025 | 57,000 | $64.65 | $3,685,050 |
| March 1-31, 2025 | 634,000 | $58.19 | $36,892,460 |
| April 1-30, 2025 | 1,596,000 | $59.25 | $94,563,000 |
| May 1-31, 2025 | 5,117,000 | $59.69 | $305,433,730 |
| TOTAL | 7,432,000 | ---------- | $442,284,340 |

82.     Given that the price of Centene stock was $33.78 per share on July 2, 2025, after the truth was revealed, the true value of the 7,432,000 repurchased shares was roughly $251,052,960. Because the stock price was inflated by the Individual Defendants' false and misleading statements, the Individual Defendants caused the Company to overpay by approximately $191,231,380 to repurchase these shares during the Relevant Period. Thus, Centene was damaged and wasted its assets.

## DAMAGES TO CENTENE

83.     As a direct and proximate result of the Individual Defendants' misconduct, Centene has lost and expended, and will lose and expend, significant sums of money.

84.     Such expenditures include, but are not limited to:

- legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in connection with the Securities Class Action filed against the Company and Defendants London and Asher;

- costs of any internal investigations, defending any investigations or legal actions taken against the Company, and payments of any fines or settlement amounts associated with the Company's violations;

- costs of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting;

- the unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company; and

- the approximately $191.2 million in losses incurred by Centene overpaying to repurchase its own common stock at artificially inflated prices.

85.     Furthermore, as a direct and proximate result of the Individual Defendants' conduct, Centene has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties and violations of law.

33

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

87.     Centene is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction that this Court would not otherwise have.

88.     Plaintiff is an owner of Centene common stock and has been a continuous owner of the Company's shares at all relevant times.

89.     Plaintiff will adequately and fairly represent the interests of Centene and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

90.     A pre-suit demand on the Board of Centene is futile and, therefore, excused. At the time this suit was filed, the Board consisted of the following nine individuals: London, Blume, Burdick, Coughlin, Dallas, Eppinger, Ford, Samuels, and Tanji (the "Director Defendants"). Plaintiff is required to show that a majority of directors, i.e. five, are incapable of exercising independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As each Director Defendant faces a substantial likelihood of liability for the misconduct alleged herein, several derive material personal benefits from the challenged conduct, including lucrative compensation and incentive awards, and many are compromised by overlapping business and personal relationships, the Director Defendants are not capable of making an independent and disinterested decision about whether to bring this action against themselves. Thus, demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

34

91.     Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

92.     The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs or recklessly and/or with gross negligence disregarded the wrongs complained of herein and therefore are not disinterested parties. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

93.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good-faith effort to prevent or remedy that situation.

94.     As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Centene, the Director Defendants knew, or should

35

have known, the material facts surrounding Centene's financial condition and internal control mechanisms.

95.    Defendant London is not disinterested or independent. She has served as a director since September 2021 and as the Company's Chief Executive Officer since March 2022. The Company acknowledges that in her capacity as CEO, Defendant London is a non-independent director. She receives substantial compensation for her executive role, as alleged above, further confirming her lack of independence. As the Company's highest officer, Defendant London failed to exercise adequate oversight over the Company's operations and internal controls, consciously disregarded her duties to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant London personally made many of the false and misleading statements alleged herein. Moreover, London solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of herself and Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Company's Incentive Plan. London directly benefits from the Incentive Plan, as she is eligible for and will receive stock awards thereunder. Lastly, Defendant London is also a defendant in the pending Securities Class Action, where she faces significant personal liability for substantially the same misconduct alleged herein. For these reasons, Defendant London faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

96.    Defendant Blume is not disinterested or independent. She has served as a Company director since February 2018, is Chair of the Governance Committee, and serves on the Audit Committee. Blume receives substantial compensation for her service as a director. Despite her fiduciary responsibilities and long tenure on the board, Defendant Blume failed to provide

36

adequate oversight of the Company's operations and internal controls, consciously disregarded her duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Blume solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of herself and Defendants London, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. Blume directly benefits from the Incentive Plan, as she is eligible for and will receive stock awards under it. Accordingly, Defendant Blume faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and excused.

97.     Defendant Burdick is not disinterested or independent. Burdick has served as a Company director since January 2022 and is Chair of the Quality Committee. The Company admits in its 2025 Proxy Statement that Burdick is a non-independent director. From 2020 to 2021, he was Centene's Executive Vice President of Markets and Products, and before that served at WellCare Health Plans, Inc. ("WellCare"), which Centene acquired in 2020, as CEO, director, and in other senior leadership positions. His long tenure as an executive and director, coupled with his ongoing leadership role at the Company, demonstrates a lack of independence. Despite his fiduciary responsibilities, Defendant Burdick failed to exercise meaningful oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Burdick solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions that resulted in the reelection of himself and Defendants London, Blume, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. Defendant Burdick personally benefits from the Incentive Plan, as

37

he is eligible for and will receive stock awards under it. Accordingly, Defendant Burdick faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

98.     Defendant Coughlin is not disinterested or independent. He has served as a Company director since January 2022, is Chair of the Compensation and Talent Committee, and serves on the Audit Committee. Coughlin receives substantial compensation for his service as a director. Despite his fiduciary responsibilities, Defendant Coughlin failed to provide adequate oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Coughlin solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of himself and Defendants London, Blume, Burdick, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it.  Accordingly, Defendant Coughlin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

99.     Defendant Dallas is not disinterested or independent. He has served as a Company director since January 2020 and is a member of both the Quality Committee and the Audit Committee. Dallas receives substantial compensation for his service as a director. Despite his fiduciary responsibilities, Defendant Dallas failed to exercise adequate oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Dallas solicited the 2025 Proxy Statement, which contained material misrepresentations and

omissions and resulted in the reelection of himself and Defendants London, Blume, Burdick, Coughlin, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it. Accordingly, Defendant Dallas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

100.    Defendant Eppinger is not disinterested or independent. He has served as a Company director since April 2006 and is a member of the Quality Committee. Eppinger receives substantial compensation for his service as a director. Despite his fiduciary responsibilities and long tenure on the board, Defendant Eppinger failed to exercise meaningful oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Eppinger solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it. Accordingly, Defendant Eppinger faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

101.    Defendant Ford is not disinterested or independent. He has served as a Company director since November 2022 and is a member of both the Quality Committee and the Compensation and Talent Committee. Ford receives substantial compensation for his service as a director. Despite his fiduciary responsibilities, Defendant Ford failed to exercise adequate

oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Ford solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions. That solicitation resulted in the reelection of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Greco, Samuels, and Tanji, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it. Accordingly, Defendant Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

102.    Defendant Samuels is not disinterested or independent. He has served as a Company director since January 2022 and is a member of both the Quality Committee and the Compensation and Talent Committee. Defendant Samuels receives substantial compensation for his service as a director. Despite his fiduciary responsibilities, Defendant Samuels failed to exercise adequate oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Samuels solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, and Tanji, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it. Accordingly, Defendant Samuels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

103.     Defendant Tanji is not disinterested or independent. He has served as a Company director since February 2025 and is a member of the Audit Committee. Tanji receives substantial compensation for his service as a director. Despite his fiduciary responsibilities, Defendant Tanji failed to exercise adequate oversight of the Company's operations and internal controls, consciously disregarded his duty to monitor and prevent the scheme to issue false and misleading statements, and failed to protect corporate assets. Defendant Tanji solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in the reelection of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, and Samuels, and in shareholder approval of the Incentive Plan. He directly benefits from the Incentive Plan, as he is eligible for and will receive stock awards under it. Accordingly, Defendant Tanji breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and excused.

104.     Furthermore, the Director Defendants are not independent or disinterested in light of their longstanding business and personal relationships with each other. For instance, Defendants Burdick and Dallas each served on the board of directors of WellCare Health Plans, Inc., which was acquired by Centene on January 23, 2020. Specifically, Defendant Burdick served as a director and as CEO of WellCare from 2015 until 2020, and in a number of other executive roles between 2014 and 2015. Defendant Dallas served on the board of directors of WellCare from 2016 until 2020. Moreover, Defendant Asher served as CFO of WellCare from 2014 until 2020.

105.     Director Defendants Blume, Coughlin, Dallas, and Tanji (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial

41

reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Moreover, the Audit Defendants failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

106. All of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and excused.

107. Each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

108. Each of the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

109. The Director Defendants' conduct could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

110. The acts complained of herein constitute violations of fiduciary duties owed by Centene's officers and directors, and these acts are incapable of ratification.

111. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct, including the maintenance of accurate records and reports, the avoidance of conflicts of interest, and the pursuant of honest and ethical manners of business. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

112. 160. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Centene. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Centene, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring

43

such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate recovery. Thus, demand on the Director Defendants is futile and therefore, excused. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Centene to sue the Individual Defendants since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

113.    For the foregoing reasons, a pre-suit demand on the Board is futile and excused.

## COUNT I

### *Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)*

114.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Centene. Centene is now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but moreover, the Company itself is one of the largest victims of the unlawful scheme perpetrated upon Centene by the Individual Defendants.

116.    During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $191.2 million to repurchase approximately 7.4 million shares of Centene common stock.

117.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and

participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

118.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Centene.

119.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included making, or participating in making, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Centene not misleading.

120.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

121.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over approximately $442.3 million in the repurchase of Centene stock at artificially inflated prices and

have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

122.   By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123.   Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT II

***Against the Individual Defendants for Violations of § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)***

124.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

126.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

127.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy Statement, which was filed with the SEC.

46

128.     The 2025 Proxy Statement was false and misleading because it failed to disclose that (i) the Company's public statements regarding financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (ii) the Company's enrollment figures were materially overstated; (iii) the Company's morbidity trends were misrepresented across all four of its business segments, especially the Medicare segment; and (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

129.     The 2025 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*: (i) the Board and company management were not effectively overseeing risks to the Company, including risks associated with the Company's public reporting; and (ii) the Company's officers and directors were not adhering to the Code of Conduct.

130.     The misrepresentations and omissions in the 2025 Proxy Statement were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the reelection of  Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

131.     The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

132.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

133.     Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT III

### *Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))*

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Centene stock at prices artificially inflated by those materially false and misleading statements.

136. Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT IV

### *Against the Individual Defendants For Breach of Fiduciary Duty*

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. Each Individual Defendant owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

139. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

140. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the

Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.   Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's statements regarding financial guidance and Centene's operational stability were based on unreliable assumptions and unsupported projections; (ii) the Company's enrollment figures were materially overstated; (iii) the Company's morbidity trends were misrepresented across all four of its business segments, especially in the Medicare segment; and (iv) the Company failed to maintain adequate internal controls and risk oversight mechanisms. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

142.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

143. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

144. Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own stock at artificially inflated prices before the fraud was exposed.

145. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

146. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

147. Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT V

### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

148. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual

50

Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

150.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT VI

### *Against the Individual Defendants for Unjust Enrichment*

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Centene.

153.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Centene that was tied to the performance or artificially inflated valuation of Centene, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

154.    Plaintiff, as a shareholder and representative of Centene, seeks restitution from the Individual Defendants and an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

155.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT VII

### *Against the Individual Defendants for Waste of Corporate Assets*

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

51

157.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

158.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase over 7.4 million shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

159.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

160.    Plaintiff, on behalf Centene, has no adequate remedy at law.

**<u>COUNT VIII</u>**

***Against the Individual Defendants for Gross Mismanagement***

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    The Individual Defendnats, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with respect to prudently managing the assets and business of Centene in a manner consistent with the operations of a publicly held corporation.

163.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Centene has sustained and will continue to sustain significant damages.

164.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

52

165.    Plaintiff, on behalf Centene, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding punitive damages;

F.    Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims set forth herein.

53

54

Dated: September 30, 2025

**WEHRLE LAW LLC**

/s/J. Chrisopher Wehrle, 45592MO
J. Christopher Wehrle, Esq.
2601 S. Hanley Road
St. Louis, Missouri 63144
Telephone: (314) 272-4113
Fax: (314) 272-4107
Email: chris@wehrlelaw.com

*Local Counsel*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff Yin Nante*